OSTRENG, Respondent, v. LOWREY and another, Appellants.

*January 3—January 30, 1968.*

558

For the appellants there were briefs by *Edwards, Hafner & McDonald* and *Roger W. Hafner,* all of La Crosse, and oral argument by *Roger W. Hafner.*

For the respondent there was a brief by *Arneson & Berg* and *Philip G. Arneson,* all of La Crosse, and oral argument by *Peter E. Berg.*

HEFFERNAN, J.   The trial judge in ruling on motions after verdict stated:

". . . the Court is of the opinion that the verdict is not defective, and that there is credible evidence in the record to sustain all the answers in the verdict."

The review of this court:

". . . must be based on the rule that when there is any credible evidence which under any reasonable view supports the jury finding, especially when the verdict has the approval of the trial court, it should not be disturbed. This is another way of saying the evidence must be viewed in the light most favorable to the verdict." *Springen v. Ager Plumbing & Heating, Inc.* (1963), 19 Wis. 2d 487, 489, 120 N. W. 2d 692.

Where damages are the subject of review on appeal, this court adheres to the view that the amount awarded is largely in the discretion of the jury. Only if the award is so excessive as to evidence that the award resulted from passion, prejudice, corruption, or disregard of the evidence or applicable law will the damage verdict be set aside.

We have repeatedly emphasized the importance of the trial judge's view of the evidence regarding damages when the award is questioned by motions after verdict. In *Moritz v. Allied American Mut. Fire Ins. Co.* (1965), 27 Wis. 2d 13, 24, 133 N. W. 2d 235, we held that his determination of whether the damage verdict is sup-

ported by the evidence will be set aside only when there is an evident abuse of discretion.

In *Ballard v. Lumbermens Mut. Casualty Co.* (1967), 33 Wis. 2d 601, 607, 148 N. W. 2d 65, we again emphasized the importance of the trial judge's analysis of the evidence supporting the verdict and the necessity of his stating the rationale upon which he reaches his decision. We therein pointed out that the failure so to do deprives the party who wishes to uphold the verdict of the added weight that is given to a jury verdict that has the approval of the trial judge.

As in *Ballard,* we find that herein the trial judge, while stating that the verdict was supported by credible evidence, failed to analyze the evidence supporting the verdict and gave no reasons that would support his conclusion. Under this state of the record, we place no weight upon the judge's findings; and we look to the evidence *ab initio* to determine whether, resolving all conflicts in the testimony in a light most favorable to the respondent, there is any credible evidence to support the verdict of the jury.

*Were the damages awarded to the plaintiff for loss of earnings until date of trial excessive*

We conclude that there is ample credible evidence to support this portion of the verdict. Plaintiff from 1956–1960 had been engaged in a small-scale lumbering operation in which he was the sole proprietor and generally the sole worker. However, from 1961 on, he commenced doing contracting and construction work. In 1961 his gross receipts were $30,000 and his expenditures $16,000, and in 1962 his receipts amounted to $33,000. In 1963 his receipts amounted to $38,000 and wages paid were $2,000. In 1964 receipts were $70,000 and wages paid were $9,000. In 1965 gross income was $135,000 and

expense for wages was $41,000. In the first ten months of 1966 (until the date of trial) Ostreng disbursed $17,000 for wages.

There was evidence that from the date of the accident to the date of trial $71,000 was disbursed for wages. It is the claim of Ostreng that a portion of these wages was incurred because additional employees were necessary to work in his stead. One measure of his wage loss, therefore, is the amount paid to those who took his place and performed work that he would have performed but could not because of the injury sustained in the accident. *See Burlison v. Janssen* (1966), 30 Wis. 2d 495, 141 N. W. 2d 274.

In the instant case there was evidence that the plaintiff had sustained an injury to the brain stem that resulted in a permanent impairment of his ability to converge his eyes so as to focus properly on nearby objects. Doctor Mannsheim testified to a reasonable degree of medical certainty that this disability was caused by the accident. The plaintiff testified that this made it difficult to read blueprints or other specifications for construction work. He became ill as the result of the optical strain, and on several occasions he sustained blackouts or near blackouts. He is able to read with relative comfort, but only for a few minutes, by occluding one eye. He testified that this disability required him to hire supervisory help that would not otherwise have been necessary. It was Ostreng's uncontroverted testimony that the supervisory help hired to do the work that he would have done had he not been injured was paid wages in the sum of $18,000 during the period from the time of the accident to the date of trial.

While the testimony of the plaintiff is neither completely consistent nor fully substantiated, it is apparent that the jury chose to believe Ostreng. Accordingly, viewing this testimony, as we must, in the light most favorable to the verdict, we conclude that the replace-

ment costs for supervisory help alone exceeded the jury's verdict of $10,000.

The plaintiff also testified that he sustained a back injury in the accident. Doctor Phillips testified that the injury complained of was caused by the automobile accident, and he "assumed" that, if the symptoms persisted four years after the accident, the injuries were permanent. Ostreng complains that he has not been able to operate heavy machinery for a normal period since the injury. He testified that he has acute backaches, and he was obliged to hire machine operators to do work that he otherwise would have done. The testimony relative to wages for substitute machine operators falls short of optimum preciseness.

Prior to the accident, plaintiff's business required employment of an unknown number of operators. Beginning in 1963, the back injury curtailed his ability to operate heavy construction equipment and required employment of additional men. In 1962, machine operators received $4.12 per hour, and as of the date of trial the union rate was $4.62. These men worked an average week of fifty-five hours through the construction season, about eight months. However, no testimony was adduced as to what amount of the work of the machine operators would have been done by plaintiff had it not been for his back injury.

Plaintiff did, however, testify that because of the back pain, he could only operate his machines about 20–25 percent of the time that he did before the accident. Thus, a considerable amount of the cost for machine operators from 1963 through 1966 ($43,000) might have been unnecessary had the plaintiff not been injured. The difficulty with this assumption, as defendant properly points out, is that we are given no indication as to what portion of the replacement cost would have been unnecessary had plaintiff worked full time. Plaintiff's testimony that he was able to operate machines only

20–25 percent of the time does not fill this gap in the plaintiff's proof.

The present case is strikingly similar to *Burlison v. Janssen* (1966), 30 Wis. 2d 495, 141 N. W. 2d 274. Burlison operated a carpentry and contracting business. He was unable to testify as to the exact amount of time lost subsequent to the accident. He did, however, establish $30,000 out-of-pocket expenses for wages paid to additional employees over a three-and-one-half-year period. The court, sustaining the jury award of $4,500 for loss of wages, commented:

> "While the proof is not documented, it does stand uncontradicted. Certainly, the reasonable cost of a bookkeeper and the amount of salary paid to the extra man attributable to work on new projects would have to be subtracted from the wage loss and out-of-pocket expense. Respondents did not attempt to prove these offsets but maintain only that appellant has not proved any wage loss to a reasonable certainty." (p. 505.)

Similarly, in the present case, plaintiff has established wage expenses from the accident to the date of trial in excess of $71,000. It is likely that a considerable portion of this sum was attributable to wages for machine operators who were required because of the plaintiff's disability. This loss, however, has not been proved to the degree of reasonable certainty that is required. It is also likely that the jury saw fit to disregard this proof, for the damages awarded can all be accounted for by the sum that was clearly required for substitute supervisory help. We conclude, as this court did in *Burlison, supra,* page 505, that plaintiff "might well have suffered a substantial loss which he did not prove, but this is not to say that he has not proved to a reasonable certainty the [$10,000] found by the jury."

Defendant also claims error in regard to this question, because the trial judge instructed the jury that it could consider "loss of profits of the business" in arriving at loss of earnings. Defendant contends that the record

is devoid of any evidence of loss of profit. We agree that no evidence of loss of profit was introduced, and no apparent attempt was made to establish loss of earning capacity by showing a loss of profits. It therefore would have been preferable to omit this reference. We do not find, however, that the defendant was prejudiced thereby, for the damages awarded for replacement supervisory help were clearly supported by the evidence, and would of themselves have substantiated an award in excess of that found by the jury.

*Were the damages awarded for pain, suffering, and disability—past and future—excessive*

The jury was instructed that they could, if justified by the evidence, award damages to the plaintiff for past and future pain, suffering, and disability and for future loss of earning capacity. The jury awarded the plaintiff the sum of $50,000. There was evidence to show that the plaintiff sustained a painful and disabling injury to his back. There was testimony that the pain and disability continued to the date of trial, although the plaintiff admitted that the pain was somewhat diminished. Damages for past pain and suffering for the back injury are clearly supported by the evidence, for there was medical testimony tending to show the painful condition of Ostreng's back following the injury. In addition, the plaintiff testified that the back was painful and interfered with his work and sleep. There was, however, no medical evidence that the back condition was permanent or was likely to cause future pain and suffering. Doctor Phillips merely testified, if the symptoms had persisted for four years after the accident as they were one year after the accident, that he would "assume" the condition would be permanent. While medical testimony is not required to support an award for past pain and suffering and testimony by the plaintiff of subjective symptoms is enough (*Bethke v. Duwe* (1950), 256 Wis. 378, 383,

41 N. W. 2d 277), an award for future pain and suffering or for the injury itself, if it or the symptoms are subjective in nature, must be supported by the opinion of a medical expert which is based upon a medical certainty or probability (*Diemel v. Weirich* (1953), 264 Wis. 265, 268, 58 N. W. 2d 651). In the instant case, while damages for the back injury may be awarded for past pain and suffering on the basis of the testimony, there is no medical testimony to substantiate an award for future damages.

The plaintiff, however, also sustained a disabling and permanent injury to that portion of the brain stem that controls the eye-convergence function. While his vision is normal at distances, the inability to converge properly results in double vision at short range. The defendant has sought continual treatment for the condition, but there has been no improvement in function despite his following prescribed eye exercises and the use of prism glasses. He is unable to read newspapers, books, and documents, such as the specifications and blueprints used in his work, unless he occludes one eye. He has frequent severe headaches and discomfort, which medical testimony attributed, in part at least, to the permanent eye disability. He complains that he has had blackouts or near blackouts following dizzy spells caused by the eye condition. He has been able to overcome these blackouts by using only one eye for close work, but even then he suffers acute discomfort and can only read for a short period. There were numerous witnesses who testified that he appeared to have difficulty seeing, had blacked out, and evidenced severe discomfort when using his eyes for close work. There was medical evidence to a reasonable degree of certainty that his eye condition was permanent.

Under this state of the record we cannot say that the award of $50,000 was excessive. It is undisputed that the plaintiff has suffered an injury that will severely handicap him in whatever work he might pursue; and in

the type of work he does, it imposes severe restrictions on his earning capacity. As a contractor he is obliged to follow blueprints and specifications. The testimony admits of the inference that he will in the future be required to hire supervisory assistants to do work that he would be able to do personally were not his vision impaired by the convergence insufficiency. The extent to which he will be damaged by his future loss of earning capacity is not susceptible to precise proof. Suffice it to say that past experience showing the necessity for hiring additional help for supervisory purposes alone supports a loss of earning capacity of more than $2,000 per year. There is every probability that the actual loss will be substantially greater.

Mr. Justice BEILFUSS in *Reinke v. Woltjen* (1966), 32 Wis. 2d 653, 660, 146 N. W. 2d 493, outlined the problems that the trier of fact must face when forecasting future loss of earnings, and summarized the standards to be applied in an effort to resolve the perplexities involved in predicting the future. He stated:

"In determining damages to be awarded for impairment of earning capacity or loss of future earnings, in most instances, the finder of the fact must deal in some probabilities. In the case where the claimant is totally permanently disabled from engaging in any gainful employment or activities his impairment of earning capacity can be calculated with a substantial degree of certainty. Most claimants do not face that drastic future but still may have suffered a loss of earning capacity. Many elements that go to a determination of impairment capacity cannot be proven with certainty. Proof of these elements must be permitted by facts or inferences that lead to reasonable probabilities. Some (but not all) of the elements which cannot always be shown with certainty are the length of time a disability will exist, the degree of improvement or additional disability that will ensue, the aptitude and ability of a disabled person to engage in other types of work, and the compensation he will be able to obtain. As to these and other uncertain elements the trier of fact must

be allowed to consider the reasonably apparent probabilities as they appear from the evidence, together with such known facts as his age, his education and training, the type work he was doing before the injury, and the compensation he was receiving, and then in its judgment determine what amount fairly and reasonably represents his loss of earning capacity, reduced to its present value."

The evidence shows that at the time of the accident Ostreng was twenty-six years old, and at the time of trial had a life expectancy of over forty-one years.

It appears without contradiction that for the balance of his life the plaintiff will be physically impaired and will suffer severe curtailment in activities that are essential in his chosen field. He has suffered great pain prior to trial and will continue to have pain and discomfort as the result of the eye disorder. While the award of $50,000 may at first blush appear high, it may indeed be modest. It must be remembered that at the time of trial Ostreng was thirty years old and was president of a corporation whose gross income had tripled in a three-year period and, in 1965, exceeded $135,000.

We cannot, in view of the evidence, conclude that the award was excessive.

Nor do we find that plaintiff's counsel was guilty of misconduct in suggesting to the jury a damage award that the defendant contends was grossly excessive and unsupported by the evidence. The law in this regard has been clearly stated by this court in recent years. In *Halsted v. Kosnar* (1963), 18 Wis. 2d 348, 352, 118 N. W. 2d 864, we stated:

"The test as to what is permissible by way of counsel's argument in presenting his lump-sum figure for pain and suffering must be a subjective one. If the attorney argues to the jury that a certain figure is sustained by the evidence, neither his good faith nor his ethics should be subjected to posttrial challenge. We reject the learned trial judge's suggestion that the request for a figure larger or lower than the court would later sustain con-

stitutes a violation of the attorney's oath. The measurement of pain and suffering is so patently thorny that the yardstick used by counsel should not be condemned merely because the court considers it to[o] long or too short.

"We recognize that there are plaintiffs' lawyers who demand 'boxcar' figures and defendants' lawyers who propose absurdly low awards. If we have faith in the jury system we must assume that jurors properly instructed will apply their common sense and reject the extremes to which partisan advocates may stretch. In our opinion, excessive demands, either too high or too low, will normally backfire. In those instances in which jurors reach a conclusion which is beyond the range of reasonableness, the law affords relief—both in the trial court and on appeal."

In *Fischer v. Fischer* (1966), 31 Wis. 2d 293, 302, 142 N. W. 2d 857, we said:

"We reiterate our faith in the jury's ability to discern or reject extremes in the appraisal of damages, and we conclude that if trial counsel are permitted to express their own subjective advocate's appraisal of damages that demands completely unsupported by evidence will be rejected by the jury. The probability of a 'backfire' in the event of an unreasonable demand is likely to make this phase of trial advocacy self-policing."

Defendant's final contention is without merit.
*By the Court.*—Judgment affirmed.